IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 15-cr-00031-JLK

UNITED STATES OF AMERICA,

      Plaintiff,

V.

SHAWN CHEEVER,

      Defendant.

_____

MEMORANDUM OPINION AND ORDER ON SENTENCING
_____

Kane, J.

      This matter is before me for sentencing on Defendant Shawn Cheever's plea to a single count of possession of child pornography. I have heard the presentations of counsel, and Mr. Cheever has been afforded his right of allocution. Because the question of a condign sentence in this case, and in cases involving plea deals negotiated in rigid adherence to non-binding Sentencing Guidelines generally, raises sentencing issues about which I have thought long and hard, I take time to address them in the following written opinion.

I.

INTRODUCTION

      Shawn Cheever's criminal record includes eleven prior felony convictions

including those for forgery, fraud, assault, drug possession, and criminal impersonation. He was also convicted of a State of Colorado misdemeanor charge of possession of child pornography.  He is known to have used at least seven different aliases.  At age 45, he has been sentenced numerous times to community corrections and probation, but in all but one instance failed to conform to community confinement rules and was sentenced to jail or prison.  In two instances, he was given deferred judgments and in both the deferrals were revoked and he was convicted.

On January 27, 2015, a two count indictment issued charging Cheever with Receipt of Child Pornography and Possession of Child Pornography. The indictment also included an unnumbered forfeiture allegation. On April 29, 2015, as the result of a plea bargain, he plead guilty to the possession charge and admitted the forfeiture allegation. The prosecution agreed to dismiss the receipt charge at the time of sentencing.  Numerous other *quids* and *quos* involving Sentencing Guideline provisions and calculations were set out in the Plea Agreement, but because the Guidelines will not be employed in this sentencing, they provide little assistance to me.

Cheever has been in custody since his arrest. The case was set for sentencing on July 22, 2015, but by stipulation of the parties the date was continued because the question arose whether the child pornography statute's recidivism provision applied based on Cheever's state conviction under the Colorado pornography statute.  If applicable, the federal statute would change the statutory penalty range of 0 to 10 years to a range from a mandatory minimum of 10 years to a maximum of 20 years.  That exact issue was then

pending before the Tenth Circuit Court of Appeals in <u>United States v. Bennett</u>, No. 14-1384 & 14-1402, 2016 U.S. App.LEXIS 9643, and the parties wanted to conserve resources and avoid an appeal or post conviction motions. On May 26, 2016, the Tenth Circuit announced its opinion in <u>Bennett</u>, holding that the Colorado statute triggered the mandatory minimum 10 year sentence. — F.3d — , 2016 WL 3034664 (10th Cir. 2016). Because <u>Bennett</u> applies to the instant case, sentencing was rescheduled for July 11, 2016.

There is now no reason why sentencing cannot proceed. The statutory penalty, with the recidivism enhancement, is not less than 10 nor more that 20 years imprisonment, a fine range of $12, 500 to $125,000 or both such imprisonment and fine together with a supervised release range from 5 years to life and a mandatory $100 special assessment fee.

II.

APPLICABLE LEGAL STANDARDS

While I have determined for reasons stated below not to employ the advisory Sentencing Guidelines, I am nevertheless obliged to review them.  <u>Gall v. United States</u>, 552 U.S. 38 (2007). The United States Probation Office has determined the correct total offense level to be 26 and Cheever's criminal history category V resulting in a Guideline imprisonment range of 110 months to 120 months.  The fine range of $12,500 to $125,000 and the supervised release range of 5 years to life are unchanged.  Neither the government nor the defendant disputes this calculation.  Because the mandatory minimum provision is triggered, however, the Guideline is revised to a range of 120 months to 137

3

months.  I have independently reviewed the criteria as applied to this case and concur

with the Probation Office's calculations.

Nevertheless, I have notified both defense counsel and the prosecution that I will

not impose a sentence based on the Guidelines; that I  base my sentence on the mandated

minimum and a full consideration of the criteria set out in 18 U.S.C. § 3553.[1] I requested

counsel to prepare their arguments accordingly and consider Cheever's allocution in the

same light.

Other district courts have rejected the Guidelines in these circumstances and I have

done so in previous cases.[2] Ordinarily "the Guidelines give a district court a measure of

---

[1] Section 3553, in relevant part, provides as follows:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--(1) the nature and circumstances of the offense and the history and characteristics of the defendant;(2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;(B) to afford adequate deterrence to criminal conduct;(C) to protect the public from further crimes of the defendant; and(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C.A. § 3553 (West).

[2] United States v. Sletten, 458 Fed. Appx 782, 2012 WL 627579 (10th Cir. 2012); United States v. Ilgen, 417 Fed. Appx. 728, 2011 WL 1097539 (10th Cir. 2011); United States v. Rausch, 570 F. Supp.2d 1295 (D. Colo. 2008); United States v. Vanderwerff, 2012 WL 2514933 (D.Colo. 2012), rev'd on other grounds 788 F.3d 1266 (10th Cir. 2015); United States v. Dorvee, 616 F.3d 174 (2nd Cir. 2010); United States v. Grober, 624 F.3d 592 (3rd Cir. 2010); United States v. Henderson, 649 F3d 955 (9th Cir. 2011);  United States v. Bennett, 2008 WL 2276940 (D.Neb. May 20, 2008); United States v. D.M., 942 F.Supp2d 327 (E.D.N.Y. 2013).

national practice to use as a starting point. . ." United States v. Smart, 518 F.3d 800, 808 (10th Cir.2008), but when Congress ignores the recommendations and studies of the Sentencing Commission and imposes a mandatory minimum sentence, the rationale and vaunted expertise of the Commission is otiose, in the sense that it produces no useful result.

As the Supreme Court remarked in Gall, "some sections of the Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" but others, "[n]otably, [are] not." 552 U.S. at 46 & n. 2. This Guideline falls into this latter category.  In fact, it is a recitation of the ipsi dixit of Congress's mandate.[3]  There is no basis for concluding that the application of such a Guideline will meet the requirement of 18 U.S.C. § 3553(a) that a sentence will not be "greater than necessary."  In fact, according to most studies, the contrary is true.[4]

Having found the correct calculation of the Guideline sentence as set out above, I find: (1) the Guidelines are not mandatory; (2) the facts have been provided by the Probation Office and subjected to objection by both the prosecution and the defense, but

---

[3] In an effort to find justification of any sort for the mandatory minimum of ten years for possession, receipt and distribution of child pornography, I conducted an extensive search and scrutiny of the legislative history of the Child Sexual Abuse Protection Act of 1994.  There were no studies, statistics, or bases presented by Congress to explain or justify why the mandatory minimum of ten years was enacted or whether any other term of years was not considered.

[4] See, passim, Caught:  The Prison State and the Lockdown of American Politics, by Marie Gottschalk (Princeton Univ. Press, 2015).

no objections remain; (3) both parties have been advised that the sentence to be imposed

will not be a Guideline sentence; and (4) both have been given full opportunity to brief

and argue their positions as to a condign sentence even though the Supreme Court in

Irizarry v. United States, 553 U.S. 708 (2008), has stated such notice is unnecessary.

Moreover, Cheever has been given a full opportunity to exercise his right of allocution.

Though I am bound by the statute and the Tenth Circuit's decision in Bennett,

*supra,* I am of the strong view that the mandatory minimum produces a sentence greater

than necessary to achieve the purposes of 18 U.S.C. § 3553(a).  A sentence of 60 months,

if permitted, would enable the defendant to participate fully and complete programs

offered by the Bureau of Prisons[5] to ensure his safe release with a minimum risk of

---

[5] Sex Offender Management Program (SOMP) consists of two programs, residential and non-residential.  The latter is 9 to 12 months and the former is 12 to 18.  An inmate is sent initially to a facility for security level assessment.  While there, the inmate must express an interest in any program, as all programs are voluntary.  A high risk offender will likely be assigned to the residential SOMP and a low risk offender to a non-residential SOMP. Cheever, based on his record of convictions and failures to succeed on probation and parole, would likely be classified as a high risk offender.  It is the policy of the Bureau of Prisons to refer an inmate only at the "back end" of his sentence, generally about 36 months before his anticipated date of release.  If, while in SOMP, the inmate is ejected from the program for any reason, he may return to the program, but only after one year of clear conduct.  Residential Drug and Alcohol Treatment (RDAP) consists of two types, residential and non-residential.  Inmates in a REDAP program are housed in a separate unit during the treatment.  The first part of the treatment lasts for at least 9 months and includes therapy, work, school or technical training.  The second part is a monitoring phase involving monthly meetings for up to one year or to the time of the inmate's release.  The third and final portion is 120 days in a halfway house.  An inmate would usually need about 24 months to complete the program.  The non-residential program is 12 to 24 weeks and includes weekly meetings.  Based on Cheever's record, the residential program is the more likely placement.  An inmate can attend a residential and a non-residential program at the same time, but two residential programs cannot be simultaneously undertaken.  Again, it is likely that Cheever's placements would be for both residential programs.  The Bureau of Prisons provides additional anger management and mental health programs as well as programs Cheever can attend for training in technical and vocational trades, mental health, parenting and arts and crafts.

recidivist behavior and still produce deterrence and punishment at a reduction in excess of $100,000 to the cost of confining him for five more years.  In its application, the imposition of a mandatory ten year sentence defeats the aspirations of § 3553(a).  I will, however, consider its prescribed sentencing factors.

III.

A.  <u>Application of § 3553(a) Factors</u>

1. <u>Nature and Circumstances of the Offense/History and Characteristics of the Defendant</u>

The facts of the offense were stipulated by the parties in the Plea Agreement:

In June 2014, the National Center for Missing and Exploited Children sent a CyperTip to the Denver FBI office advising that a "Google Picasa" user had uploaded four images of child pornography on March 2, 2014 from the email account <allitman 1 @gmail.com>, with the associated name of Shawn Cheever of Denver and Facebook account "TylerDurdan1024."  The FBI investigated using administrative subpoenas and court issued search warrants revealing that the uploading of the  images was performed at Cheever's residence.
The search warrant was executed on January 6, 2015.  Cheever was present but the computers were not turned on.  The laptop and external hard drive were seized, along with several other laptops belonging to others which Cheever advised were there for him to repair.  Cheever admitted to the FBI agents that the subject laptop and hard drive contained child pornography and that he viewed the same whenever he was high on methamphetamine and heroin. A forensic examination revealed approximately 172 images of

---

Some of these programs have waiting lists that depend to an extent on the security level of the institutions and appropriate security classification is necessary for transfer to a specific facility. A considerable influence on such security classifications is the record of behavior and participation in programs by the inmate.  In other words, much of the successful participation in these programs is dependent on Cheever's conduct and demonstrated attitude while incarcerated. Based on the calculations described, the most needed programs for Cheever are SOMP, RDAP and anger management.  The least amount of time required for completion is four to five years. That time constitutes a reasoned basis for determining the length of a condign sentence rather than the obviously arbitrary yet compelled sentence of a mandatory minimum ten years.

child pornography on the laptop and the external hard drive, both of which had been manufactured outside the District of Colorado. A review of Cheever's email account disclosed that on October 28, 2014 he had received approximately 48 images of child pornography from someone who had seen his photos on Imagesource. Cheever admitted the material portrayed a prepubescent minor who had not attained the age of 12 involved in sadistic or masochistic conduct and other depictions of violence, and that the depictions involved the use of a computer.

It serves no useful purpose to describe the images and videos with particularity. Suffice to say they are lurid and graphic images of young children, boys and girls, involved in demeaning sexual poses and activities.

As mentioned above, at the time of the instant offense, Cheever had previously been convicted on a State of Colorado charge of Sexual Exploitation/Child-Possessing Material in violation of Colorado Revised Statute 18-6-403(3)(b.5), a Class One Misdemeanor. Cheever admitted to FBI agents that he posted on a website known to be used for purposes of transmitting child pornography and once wrote on it: "If you want to trade pics of girls 10 to 30 no fatties no boys just send me something and I will reply." When individuals responded, he would advise they must send him something first (child pornography). After receiving these images, Cheever did not reciprocate with the promised images. In order to avoid having his probation or parole officers know or have access to his use of these sources, Cheever had set up a fictitious Facebook page with the alias "Brook Dakine" and then another under the name "Tyler Durden 1024"

When officers went to his residence to execute the search warrant, he refused to answer or open the door. The officers breached the door and gained entrance though

Cheever attempted to block them.  When later he was asked why he would not open the door, he said, "I am an American.  I have a right not to answer my door.  I never answer the door for cops and I never will."  He admitted further that during the 15 or 20 minutes before the door was broken, he had been texting friends to let them know he was going back to jail and asking them to put money on his account books.

Shawn Alexander Cheever was born in Denver, Colorado, to Donna Bell McKim. He did not meet his father, Robert Cheever, until he was 15 years old.  He later discovered that the father of his two half-brothers was Robert Cheever's brother, Laverne Cheever.  Donna Bell McKim remarried Gerald Dewayne McKim when Shawn Cheever was 4 years old.  He and his half-brothers were raised by Donna and Wayne McKim.  The brothers considered Mr. McKim their father.  The couple divorced when Shawn Cheever was an adult.  His mother is 69 years old, retired and lives in Nebraska. Wayne McKim is now 75 and lives in Iowa.

Cheever asserts he has a good relationship with his mother, except when he has used drugs.  Mrs. McKim states she speaks with Cheever on a weekly basis and has been to see him a few times during his present incarceration.  She states she is unaware of the charges against him and did not want the probation officer interviewing her to advise her. She stated, "If he wants me to know, he'll tell me." Cheever's older half-brother, Stacey Bell, died in 2009 due to complications from diabetes.  His older half-brother, Edward Bell, is now 48. The two have telephone contact with one another every month or two and maintain a cordial relationship. Cheever relates that McKim would physically abuse the

older boys on occasion until they left home.  When Stacey Bell died, Cheever states he became the recipient of the abuse. Mrs. McKim denies the abuse allegations. Cheever left home at the age of 15.  He was adjudicated a juvenile delinquent the following year.

Cheever had a common law marriage to one woman from about 1995 through 2006 when they divorced. He reports the marriage was marred by their use of heroin. The union resulted in a daughter, who is now 19.  Cheever has had no relationship with the daughter in the past three years and owes back child support. For the past 13 years Cheever has had a relationship with a woman now age 46.  They met at a halfway house in 2002 or 2003.  She was then in custody for possession of a controlled substance, served a five month sentence and reports being drug free since her release.

In 1994 Cheever fell three stories from a roof in a work related incident and received traumatic brain injuries. He was in an intensive care unit for one month and suffers from some incidental partial amnesia. At one time he was paralyzed and had to undergo rehabilitation at a neurological center for about two years.  He continues on occasion to experience seizures and loses his sense of time.  As a result, he does not drive cars.  When he was younger, while riding a bicycle with his half-brother, he was in a collision with a car and has since been struck twice by cars but reports no major injuries as a result.  He has eight tattoos on his chest, back, shoulder, and left thumb.  He has had no mental health treatment, but admits to being a "cutter" and claims to have stopped.  He was, however, caught while in custody for the present charge with prohibited possession of razors hidden in his cell and his cutting was confirmed by jailers. There is no

10

immediate need of medical treatment, but the seizure problem is unresolved.

As a consequence of his state misdemeanor conviction for Sexual Exploitation/Child-Possession Material, Cheever was required to register as a sex offender and attend sex offender treatment.  He complied with the registration requirement, but he failed to enter offense-specific treatment as directed.  He was instructed by the state probation department to submit to maintenance and monitoring by polygraph and failed to report as scheduled or to be tested.  A Sex Offense-Specific Evaluation was completed on August 20, 2012, the conclusion of which was that he "presents with concern," which translates in essence to a lack of personal accountability, denial, and lack of motivation for treatment.  His test scores show a low propensity for violent recidivism.  The evaluative recommendations were for anger management, sex offense specific therapy and substance abuse treatment.

A psychological assessment completed on July 18, 2015, showed his "abstract problem solving abilities were found to be in the low range." His "response pattern suggests his behavior is characterized by physical and emotional withdrawal, motivated by a deep-seated fear of rejection by others."  When "faced with stressful situations, he is likely to become more detached and to withdraw into his protective shell."  Cheever reported that he was "currently feeling anxious, dejected and hopeless, and that he is bothered by memories of a troubling event ."  The evaluator determined he did not meet criteria for Paranoid, Antisocial or Narcissistic Personality Disorder.  He did, however, acknowledge an interest in online sexual behavior and previously engaging in illegal

11

online activities.  He showed no interest in building online relationships or engaging in online activities that involved interpersonal relations.

The assessment of Sexual Interest revealed that Cheever identified adolescent and adult females as groups of individuals he is generally sexually interested in.  He stated he watches pornography when "high" as a masturbatory stimulus.  He denied any interest in deviant activities. The evaluator's diagnostic impression was that Cheever has a specific personality disorder of mixed avoidant and depressive features, unspecified anxiety disorder, unspecified depressive disorder, opioid use disorder, and stimulant use disorder. He does not have an antisocial personality disorder and has not committed hands-on sexual offenses.  He currently appears free of symptoms typically associated with a thought disorder.  His failure to comply with court ordered mandates shows a high risk for conditional release and a high risk for further pornography related offenses if he has access to drugs and resumes using them.  He did express a desire to engage in treatment in order to understand his behavior.  This seems to be a departure from his previous comments and conduct.

Cheever first started drinking alcohol in the 7th grade and last consumed alcohol shortly before his arrest for the instant offense.  He first used marijuana at age 11 and last used it in January, 2015.  He smoked marijuana about once a month, but says the newly available marijuana in Colorado "is too much."  He first used cocaine in the 8th grade and used it daily for one or two years.  He used crack cocaine at age 26 shortly before going to prison.  He tried LSD a few times as a teenager, but not thereafter.

12

In 2001-2003, Cheever was a daily user of methamphetamine. He was a heavy user until 2006.  He was drug free from 2006 until December, 2013, when he started using a combination of methamphetamine and heroin and did so regularly until his arrest for the instant offense.  Once in custody, he was placed in medical housing due to withdrawal symptoms.

While not in custody for extended periods of incarceration, Cheever has been employed as a waiter, as a firewood supplier, and in online computer work.  He has a GED and completed online community college courses in graphic design.  He has paid taxes sporadically, has no known assets and a negative net worth of $17,069.88, which includes a $12, 762.88 arrearage in child support. Psychosexual Evaluation filed on July 8, 2015, prepared by a licensed clinical psychologist, concludes that Cheever's most serious problem is drug abuse and that his other difficulties including resort to child pornography, failure to function successfully while on community supervision, and intermittent failures in personal relationships accompanied by abusive behavior are related to, if not entirely precipitated by, chronic and heavy drug use.  His risk assessment for future recidivism is moderate to high depending on his access to and abusive use of drugs.  His risk for "hands-on" offenses is low.  His work history and capability when not abusing drugs demonstrate he can be self-supporting in lawful occupations.  The emphatic recommendation of the evaluator is that Cheever, while in custody and thereafter, receive substance abuse treatment with traditional treatment modalities and specific ones including "Feeling-State Addiction Protocol, Desensitization of Triggers

and Urge Reprocessing Protocol and Reprocessing Therapy."

## 2. The Need for the Sentence Imposed

A.   *To reflect the seriousness of the offense, to promote respect*
     *for the law, and to provide just punishment for the offense.*

The manufacture, distribution, and possession of child pornography constitute serious crimes not because of their focus on prurient interest or even that child pornography is obscene, which it most certainly is by any standard.  Rather, in New York v. Ferber, 458 U.S. 747 (1982), the Supreme Court held that the government may prohibit the exhibition, sale or distribution of child pornography even if it does not meet the test for obscenity because "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.' . . . . [T]he use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child."  The Court in Ferber said that child pornography is closely related to child abuse because children are harmed by the permanent record of their involvement in pornography and they are exploited in the making of it.

Consumers, even "mere voyeurs," create a demand for the production and distribution of child pornography of the most damaging kind. Forensic pediatricians such as Sharon W. Cooper, M.D., provide powerful and convincing evidence that the children who have been exploited to satisfy this perversion suffer long-term devastating effects.[6]

---

[6] *See* Rausch, 570 F.Supp.2d at 1305.

14

Dr. Cooper writes that the images of this kind of child abuse carry with them lasting

feelings of guilt, self-blame and shame for children above the ages of 4-5 years.

Moreover, such victimization produces eating disorders such as bulimia, anorexia nervosa

and obesity and increases the risk for diabetes, heart disease and stroke.  More obvious,

the *sequelae* include numerous mental health problems of which the three most common

are depression, anxiety, and posttraumatic stress disorder. Other losses include out of

home placement, transience, poor academic performance, greater risk for deviant sexual

behavior, substance abuse, mental dysfunction, self-inflicted injuries, increased risk

taking, and suicide. Female victims are 28 times more likely in adulthood to be arrested

for prostitution. These ruinous effects justify proscription and deterrence as essential

societal objectives.

Punishment is an unpleasant subject and its efficacy in many cases is questionable.

Nevertheless, punishment is an integral part of the sentencing constellation. The noted

English jurist, Lord Justice Denning, called punishment "the emphatic denunciation by

the community of a crime."  When imposed in public with stated reasons expressed,

punishment reinforces the community's respect and declaration of its moral and legal

standards and for that reason is justifiable.  When imposed, however, in secret or without

rational justifications, it becomes more mocked than feared.  As stated by Thomas

Jefferson, "[I]f the punishment were only proportioned to the injury, men would feel it

their inclination as well as their duty to see the laws observed."[7]

Arbitrary punishments, however, are just that and serve little, if any, positive purpose. Even the utilitarian assertion that punishment serves a positive purpose is mitigated by its proviso that every human being should be treated with at least a minimum of respect as a source of rights and expectations and not merely as an instrument for promotion of the social order. Ironically, the revulsion widely felt about crimes involving child pornography is exacerbated by the utter lack of empathy shown to the child victims by the offenders. That callousness alone is a factor that increases the proportional measure for punishment.

Section 3553(a) provides evaluative criteria to achieve balance between the order of society intended to be protected by punishment and the utilitarian view that every human being must be afforded dignity. The stated criteria often clash and not all apply in every case, but they demand individuated considerations: No one size fits all. The object of this balancing process is not to fill in the blank of some mechanical calculation, but to impose a decent, appropriate and deserved sentence under all attendant circumstances. The imposition of mandatory minima removes that balancing from the sentencing calculus and is therefore antithetical to the adjudicative process. The result is a punishment without any expression of rational justification. The ten year mandatory minimum in this case preempts the formulation of a sentence that is sufficient, but not

---

[7] "A Bill for Proportioning Crimes and Punishment in Cases Heretofore Capital," 1779, in *Papers of Thomas Jefferson* 2:492, 493 (Julian P. Boyd ed. 1950).

"greater than necessary" to achieve the salutary purposes of Section 3553(a).

Moreover, the duration of a sentence to prison is not the entire punishment imposed pursuant to federal law.  It is often said that imprisonment, the loss of liberty while confined, is the punishment for the crime and that the sentence that fits the crime is a condign one.  But that statement is neither accurate nor complete.  Once released, a prisoner in the United States is frequently barred from the very aspects of law-abiding citizenship that rehabilitation and reform are intended to achieve.  A released prisoner is frequently denied the right to vote, the right to sit as a juror and the right to participate in or hold elective office.  The released prisoner is barred from numerous entitlements such as public housing, pensions, disability benefits, and perhaps schooling, food and health care.  Some public employment is barred and employment in the private sector is exceedingly difficult to obtain.  Some companies involved in contracts with the government are likewise prohibited from employing convicted felons.  Most released offenders do not receive any assistance in gaining employment or subvention until a legitimate income is received.  Small wonder that recidivism is the rule rather than the exception.

B.    *To afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.*

Plainly stated, Cheever has been violating one criminal law or another since at least the age of 15.  Only once has he successfully completed probationary release.  He is clearly a recidivist and his record demonstrates that lenient sentences such as the many

times he was sentenced to community corrections have failed to have any corrective impact. The record of his having engaged in violent behavior began in 1994 when he plead guilty to menacing-use of a deadly weapon and third degree assault and was extended in 1997 when he was again convicted of third degree assault. His other felony convictions are for theft, forgery, burglary, criminal impersonation, and possession of controlled substances. His lengthy record of felony convictions appears to be related to his need to buy drugs and support his addictions. That is quite clearly not a justification for his deviant behavior.

The various psychological evaluations agree that Cheever's resort to observing child pornography is likewise drug related. While the risk of recidivism is high if he resumes taking drugs, the best means of preventing further crimes by Cheever is to provide successful substance abuse treatment. Because of the mandatory minimum sentence of ten years, the public will be protected from further crimes by him during his incarceration, but without intensive treatment, risk to the public will not be attenuated. All other considerations aside, the best and most efficient chance for protecting the public and deterring Cheever is to provide treatment in the various recommended modalities.

C.    *To Provide the Defendant with needed educational or vocational training, medical care and other correctional treatment in the most effective manner.*

As previously stated, Cheever has demonstrated employable skills. Additional training in graphic design and computer maintenance and repair would benefit him, but should receive a lower priority than the recommended treatment programs. The essential

need is for medical and psychological care and treatment.  Given his record of not

cooperating with community confinement programs, failing to report or comply with and

submit to specific treatment programs in the past, his prognosis is guarded at best.

IV.

THE SENTENCE TO BE IMPOSED

There is no ambiguity regarding the perimeters of an allowable sentence. Cheever

is subject to the mandatory minimum of ten years and a maximum of twenty years.  I have

described as best I can that this mandatory minimum is greater than the time needed to

provide the necessary treatment programs and, as such, is counterproductive to a

sentencing plan to reduce the risk of further criminality on his part. Congress has

determined that the need for punishment of this most serious crime, however, justifies a

sentence of ten years followed by supervised release, and I must acquiesce in that

determination.

The instant offense involved the defendant knowingly possessing child

pornography including approximately 178 images. Some of the images involved a

prepubescent minor. Some of the images portrayed masochistic and sadistic conduct, and

other depictions of violence.  The activity engaged in by the defendant is indeed serious

and causes unrelenting harm to the victims and to the entire community.  To the extent the

defendant possessed these images, he contributed to the demand and market for further

pornography and its consequent victimizing of helpless children.

The defendant has a negative net worth and no prospects of income so that a fine

would be superfluous. There is no claim for restitution and Cheever has abandoned any claim to the property seized incident to his arrest.  The $100 special assessment fee is mandatory.

I have given considerable thought to the length of supervised release to be imposed.  The defendant is now 45 years old.  With credit for good time, should he earn it and deserve it, he will be eligible for supervised release when he has served 85% of his sentence, or 8.5 years.  Whether he receives credit for the time he has been confined pending this sentence is a matter entirely within the discretion of the Bureau of Prisons. Thus, upon release from incarceration, Cheever will be about 53 years old.  Whether he succeeds in completing the programs that will be afforded him in prison is a matter that is entirely up to him. If he does succeed, the best judgment from the evaluating experts is that he will need more programs and treatment while on release.

Society is paying much more now for his confinement and possible rehabilitation than it would have spent to correct his childhood and adolescent neglect.  The length of supervised release according to statute is in a range from 5 years to life.  At some point, Cheever's age will have a substantial effect on his risks to the public such that further supervision would be unavailing.  Given the need, however, for continuing supervision and treatment, and the anticipated length of treatment programs, a sufficient period of supervised release is necessary.  In the specific circumstances of this case, the probation professionals who will supervise Cheever's release recommend the length of it should be 15 years.  I agree and see no reason to dispute the recommendation.

20

Therefore, it is the judgment and sentence of this court that the defendant, Shawn Cheever, is hereby committed to the custody of the U.S. Bureau of Prisons for a term of ten years  Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 15 years.  The defendant shall immediately pay a special assessment of $100.  I find the defendant does not have the ability, prospects or resources to pay a fine, and so I waive the fine in this case.

It is further declared, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure and the Plea Agreement signed by Mr. Cheever and his counsel, that Cheever forfeit his interest in the following to the United States: (1) a Dell Laptop computer bearing serial number 45VM8F1; (2) a WD hard drive bearing serial number WCALK1373091; and (3) a Samsung cell phone.

It is the strong recommendation of this court that while in the custody of the United States Bureau of Prisons and thereafter under supervised release, including release to halfway house facilities, the defendant receive substance abuse treatment with traditional treatment modalities including, but not limited to Feeling-State Addiction Protocol, Desensitization of Triggers and Urge Reprocessing Protocol, as well as Reprocessing Therapy.  It is further recommended that the defendant participate in the following programs: Sex Offender Management Program (SOMP); Residential Drug and Alcohol Treatment (RDAP); anger management and such mental health programs as evaluators deem appropriate.  The defendant should also be afforded the opportunity to participate in such voluntary programs as Alcoholics Anonymous, NarcAnon and any

21

similar organization providing abstinence and recovery assistance to sex offenders.[8]

While on supervised release, Cheever is subject to the following conditions and they may not be changed or modified without the prior authorization of this court.

1.  The defendant shall report within 72 hours of his release from imprisonment to the Probation Office in the federal district to which he is assigned.

2.   The defendant shall not leave the judicial district to which he is assigned without the prior written permission of the court or probation officer.

3.  The defendant shall report to the probation officer promptly in a manner and frequency directed by the probation officer.

4.   The defendant shall at all times answer truthfully all inquiries by the probation officer concerning the conditions of supervised release and his activities while on supervised release and shall follow explicitly the instructions of the probation officer.

5.   The defendant shall not incur debt or credit without the prior permission of the probation officer.  The defendant shall provide any and all financial information upon request of the probation officer.

6.   The defendant shall maintain employment and work regularly at a lawful occupation unless excused for acceptable reasons such as illness or lack of employment availability as determined by the probation officer.

7.   The defendant shall notify the probation officer in person or in writing duly delivered

---

[8] *See supra*, n.5.

at least ten days prior to any change in residence or employment.

8.   The defendant shall refrain from imbibing, injecting, inhaling or otherwise using any intoxicating substances and shall not possess, purchase, use, distribute or administer to himself or anyone else any controlled substance or use or possess any paraphernalia related to any controlled substance, except as prescribed by a licensed physician with notice given in advance to the probation officer nor shall the defendant use, possess, or sell any marijuana or its derivatives (including THC) in any form, including edibles, and shall not enter any marijuana dispensary or grow facility even if permitted by any state law.

9.   The defendant shall not frequent any places where controlled substances are illegally sold or used, distributed or administered.

10. The defendant shall not associate with any persons engaged in criminal activity or deriving any income therefrom.  Unless specifically authorized by the probation officer, the defendant shall not associate with any person convicted of a felony except to participate in any approved treatment programs during sessions of such programs, but neither before nor after them.

11.  The defendant shall permit a probation officer to visit him at any time or place and shall permit confiscation by the probation officer of any contraband observed in plain view.

12. The defendant shall notify the probation officer within twenty-four hours of being arrested or questioned by a law enforcement officer for whatever reason.

13.  The defendant shall not enter into any agreement to act as an informer or special agent or source for or on behalf of any law enforcement agency without the prior written permission of the court.

14.  The defendant shall comply with all reporting laws including the Adam Walsh Act and shall notify third parties, including employers, of his criminal convictions and his status on supervised release.  The probation officer is hereby authorized and directed to make similar notifications to anyone who in the judgment of the probation officer needs to know or to confirm the defendant's compliance with this notification requirement.

V.

SPECIAL CONDITIONS OF SUPERVISION

In addition to the foregoing standard conditions, the defendant shall comply with the following special conditions:

1.  The defendant shall participate in and successfully complete a program of testing and/or treatment for substance abuse, as approved by the probation officer, until such time as the defendant is released from the program by the probation officer.  The defendant shall abstain from the use of alcohol or other intoxicants or depressants during the course of treatment and shall pay such of the costs of treatment as he is able as directed by the probation officer.

2    The defendant shall participate in and successfully complete a program of mental health treatment as approved and directed by the probation officer, until such time as the

defendant is released from the program by the probation officer..

3.    The defendant shall participate in and successfully complete a program of sex offender evaluation and treatment, as approved by the probation officer.  Any such program, however, shall *not* include polygraph, penile plethysmograph[9] and or visual reaction time measuring instruments.  <u>For a detailed explanation of this exclusion</u> <u>see the attached Addendum to this Memorandum Opinion and Order which is incorporated here by this reference</u>.

4.    The defendant's use of computers and internet access devices shall be limited to those that the probation officer specifically authorizes in advance of any such use or programming.  The defendant shall submit his person, property, effects including any car, computer, books, papers, other electronic communication devices or copies to search by the probation officer at any time in order to monitor compliance with this order.

5.  The probation officer is authorized to install and the defendant shall permit any such installation of any software or hardware designed or intended to monitor computer activities on any computer the defendant is permitted by the probation officer to use.  A

---

[9] *Dorland's Medical Dictionary, 25th ed. p. 1210*, defines plethysmograph as an instrument for determining and registering variations in the volume of an organ, part or limb and in the amount of blood present or passing through it;"It does not specifically mention the penile plethysmograph, but a definition is found in <u>United States v. Weber</u>,451 F.3d 552 at 561-62 (9th Cir.2006), *viz., "*. . .a test to designed to measure a man's sexual response to various visual and auditory stimuli. . . . [T]he male 'places on his penis a device that measures its circumference and thus the level of the subjects arousal as he is shown sexually explicit slides or listens to sexually explicit audio 'scenes'". . . . Plethysmograph testing is 'exceptionally intrusive in nature and duration.  The testing includes both physical and mental intrusion, typically lasts for two to three hours per session, and <u>the accuracy and reliability of the testing is subject to serious questions</u>." (Emphasis added)

notice shall be placed on the computer at the time of installation to advise and warn others of the existence of such monitoring software on the computer.  The defendant shall not attempt or cause to be made any removal, tampering or reverse engineering, or any other means or method of circumventing the software/hardware described above.

Dated July 18, 2016.

_s/John L. Kane_____
SENIOR U.S. DISTRICT JUDGE

## ADDENDUM TO MEMORANDUM OPINION AND ORDER ON SENTENCING
Defendant Shawn Cheever
Criminal Case No. 15-cr-31-JLK

The Presentence Investigation Report for this case prepared by the United States

Probation Office contains in its proposed special conditions at paragraph 3 pertaining to

sexual evaluation and treatment a generalized provision which I refuse to include in my

judgment and sentencing order. The Tenth Circuit has held that a district court cannot

delegate the decision of whether to subject a defendant to residential treatment or penile

plethysmograph testing to a probation officer and that penile plethysmograph testing

"must be imposed by the district court and supported by particularized findings that it

does not constitute a greater deprivation of liberty than reasonably necessary to

accomplish the goals of sentencing." United States v. Mike, 632 F.3d 686, 696 (2011).

Despite this clear ruling, the Probation Office persists in including the generalized

provision in its Presentence Reports and Recommendations in child pornography cases

without indicating that a hearing before the court based on the discrete circumstances of

the case is required nor has the government advised the court or requested a hearing in

these cases.[1]

Three years after Mike, following a thorough analysis, my colleague, Judge

Blackburn held that a condition of supervised release requiring plethysmograph testing

---

[1] The government bears the burden of proof of contested facts in sentencing proceedings. See  United States v. Dougan, 684 F.3d 1030, 1034, n.3 (10th Cir. 2012).

1

would not be permitted without the court making factual findings and conclusions on an individualized determination "that (1) such testing will promote the goals of supervised release in relation to [the named defendant] in particular; and (2) such testing would involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release in the case of [the named defendant]." United States v. Behren, 65 F.Supp.3d 1140, 1156 (2014).

The special conditions portion of the instant Presentence Report I reject seeks to authorize a treatment provider to require polygraph, plethysmograph (PPG) and visual reaction time measurements.  This is a blanket authorization, but who defines or establishes or enforces the requirements cannot be ascertained unless such a program is implemented.  The person subject to the provision is required to pay for the costs of these tests, consequent evaluations and treatments and to comply with the rules and restrictions specified by such a treatment agency, but such costs, rules and restrictions are not disclosed.

I scarcely know where to begin in expressing reasons for rejecting this proposal. What leaps from the page is the expectation to intrude on the freedom, however limited, of a person on supervised release for 15 years by requiring him to comply with unarticulated rules and restrictions specified by an unnamed contract agency that may presently exist or be formed in the future and comprised of individuals over whom the court has no authority or capacity to monitor. The Probation Office advises that contract agencies will not provide their services without the provision requiring the person to

submit to polygraphs, plethysmographs and visual reaction time measurements.

The stark solution to that problem is this: If a contracting agency or therapist will not provide sex offender evaluation and treatment without using these or similar devices, the Probation Office will need to find another who will.  Failing this, the special condition will be abated until a court-approved source providing sexual evaluation and treatment without these tests can be secured.

A person released from prison and set free on supervision requiring plethysmograph testing faces the Hobson's choice of submitting to mind intrusive examinations or having his supervised release revoked for violating a special condition and returned to prison.  A court, faced with such a violation must either enforce the condition by revocation or modification of supervised release or decline and thus trivialize the integrity of the process.  If, indeed, a condition is rational, it should be enforced.  The proposed special condition, however, does not meet the test of even minimal rationality, much less is it one that does not intrude into the province of fundamental freedoms.

The standards for determining whether a given test will promote the goals of supervised release and whether such a test involves no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release are not the same as those used to determine whether evidence of such tests is admissible under the Federal Rules of

Evidence.  <u>United States v. Dotson</u>, 324 F.3d 256,261(4th Cir. 2003).[2]  But evidentiary cases can provide valuable insight into determining whether such tests are sufficiently reliable to justify their imposition.  Moreover, in the event a contested hearing were to be held to determine whether refusal to submit to a plethysmograph test constituted grounds for revocation , the evidentiary rules would obtain, even if relaxed.

## I.

The penile plethysmograph fails to meet the standards of <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993) which requires 1) that the theory or technique can be or has been tested; 2) the theory or technique has been subjected to peer review and publication: 3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation is known; 4) there are operational standards for using the technique; and 5) the theory or technique has been generally accepted in the particular scientific field.

As stated by the Court of Appeals for the Fourth Circuit, "[T]he scientific literature addressing penile plethysmography does not regard the test as a valid diagnostic tool, because although useful for treatment of sex offenders, it has no accepted standards in the

---

[2] Citing <u>United States v. Powers</u>, 59 F.3d 1460, 1471(4th Cir.1995), the <u>Dotson</u> court states that the plethysmograph is "useful for treatment of sex offenders."  The statement in <u>Powers</u>, however, was dicta made in the course of a Rule 702 analysis of plethysmograph testing as a basis for expert testimony and was not supported by any data at all.  In sum, the statement is the very tissue of *ipse dixit*.  Moreover, the <u>Powers</u> court concluded the paragraph in which the statement appears with this: "Accordingly, in light of extensive, unanswered evidence weighing against the scientific validity fo the penile plethysmograph test, we cannot say the district court abused its discretion {in excluding this evidence]."

scientific community." <u>U.S. v. Powers</u>, 59 F3d 1460, 1471 (4th Cir. 1995).  Since its

adoption, the penile plethysmograph has raised a number of questions, namely, whether

sexual desires are capable of the calibration that the device suggests.[3]  While there is

surely a correlation between sexual attraction and erectile responses, the Penile

Plethysmograph takes examination a dangerous step further, bearing a striking

resemblance to such pseudoscientific practices as phrenology[4] and physiogamy.[5]  The

credibility of the penile plethysmograph is highly disputed in the scientific community as

it is susceptible to errors and lacks the standardization that could affirm the reliability of

its results.

<u>Test Manipulation:</u> According to the *Diagnostic and Statistical Manual of Mental*

*Disorders IV,* The reliability and validity of [the penile plethysmograph] in clinical

assessment have not been well established, and clinical experience suggests that subjects

can stimulate response by manipulating mental images."[6] Some clinicians and sex

---

[3] Jason R. Odeshoo, *Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Sex Offenders*,  14 Temp. Pol. & Civ. Rts. L. Rev. 1, 4 (2004).

[4] *See generally*, *The History of Phrenology*, Phrenology, (May 1, 1998) http://www.phrenology.org/intro.html (last visited Jul. 11, 2016) ("Phrenology is the science which studies the relationships between a person's character and a morphology of the skull.").

[5]*See generally*, Robert Todd Carroll, *Psysiognomy*, The Skeptics Dictionary, http://skeptic.com/pseudosc.html (last visited July 11, 2016) ("Physiognomy is the interpretation of outward appearance, especially the features of the face to discover a person's predominant temper and character.").  An example would be to say, "I know he's a good person because I looked him in the eye.

[6] Diagnostic and Statistical Manual of Mental Disorders 524 (Am. Psychiatric Ass'n, 4th ed. 1994).

offenders have admitted to the ease, particularly in laboratories, to stifle arousal and

manipulate the results of the plethysmograph test. Not only are many subjects able to use

cognitive strategies to suppress their erectile responses, some are even able to display

physical arousal to stimuli they <u>do not</u> find erotic. This allows individuals with deviant

adult male tendencies to appear "normal."  Another study found that 80% of subjects

were able voluntarily and completely to inhibit their sexual arousal as measured by the

plethysmograph.[7]

<u>Lack of Standardization</u>: More significant than the ability to manipulate test results,

however, procedures for administering the penile plethysmograph are not standardized.

This includes a lack of criteria for the duration, equipment used, type of stimuli used, and

the content.[8] "Some materials are rather tame, e.g., nude adults, children in underwear or

bathing suits.  Others use hardcore pornography, including depictions of rape and

pedophilia."[9]

There is no uniform standard by which arousal data is correlated with deviant

behavior.  Thus, because therapists have the unfettered discretion to define certain arousal

as deviant, they have ultimate control over treating protocols and declaring when the

---

[7] Major Christopher Matthews, Major John E. Hartsell, Captain Maureen Kohn, *Debunking Penile Plethysmograph Evidence*, 28 No. 2 The Reporter 11, 3 (2001).

[8] Odeshoo, *supra* n. 1, at 6

[9] Robert Todd Carroll, *Penile Plethysmography (PPG)*, The Skeptics Dictionary, http://skeptic.com/penilep.html (last visited July 11, 2016).

"deviant" is "cured."[10]  Although the American Treatment for Sexual Abusers (ATSA) has issued guidelines for plethysmograph administration, the guidelines are very general and are loosely followed.  "At the present time. . . virtually all researchers agree that PPG's current lack of standardization is unacceptable.  That fact alone casts serious doubts on any of the positive findings concerning PPG's reliability and validity."[11]

Instances of Test Failure: Plethysmograph test results have shown blatant inaccuracies. Researchers have commented on the test's susceptibility to false positive and false negative results: one study classified 42% of pedophiles as having normal sexual preferences,[12] while an additional study demonstrated a purported child preference profile in 35% of pedophiles.[13] Another study indicates that a significant number of proven sex offenders display no pattern of arousal on the plethysmograph.[14]  According to some researchers, this figure may be as high as 15%.[15] Other researchers have found many men with "normal" sexual preferences — having committed no deviant sexual act — showed

---

[10] *See id.*

[11] Odeshoo, *supra* n. 1, at 6

[12] Walter T. Simon & Peter G.W. Schouten, *The Plethysmograph Reconsidered: Comments on Baker and Howell*, 21 Bull. Am. Acad. Psychiatry & L. 505, 508 (1993) (*citing* J.S. Wormuth, *Assessing Deviant Sexual Arousal: Physiological and Cognitive Aspects*, 8 Advanced Behav. Res. & Therapy 117, *pincite* (1986)).

[13] *Id.*

[14] Odeshoo, *supra* n. 1, at 5.

[15] *Id.* (citing *Dutchess Cty. Dep't of Soc. Servs.* ex rel *T.G. v. Mr. G*, 141 Misc.2d 641, 648, 524 N.Y.S.2d. 64 (N.Y. Fam. Ct. 1988)).

considerable arousal to illicit depictions of naked children or children engaged in sexual activity.  In one early study, PPG tests found that men with no deviant object preferences showed positive sexual reactions to 6 to 8 year old female children.  The inventor of the plethysmograph device, Karl Freund, was lead to conclude that although the "study [did] not imply that every adult male is equally erotically sensitive to little girls,"[16] the "number of people sensitive in this regard among males who have non-deviant sexual preferences must be substantial."[17] His finding demonstrates that many "normal" men bear deviant sexual desires for children, and are able to restrain these desires.  (Emphasis added.) These findings warrant a number of interpretations: namely, that such arousal is not deviant, but the lack of self restraint is; and perhaps less controversial, physiological erectile responses do not consistently indicate sexual interest. The number of test inaccuracies justifies skepticism in the scientific community regarding the PPG's reliability and validity. The use in therapy of such highly suspect gadgets encourages the acceptance of unsound conclusions.

Proponents of using the penile plethysmograph correlate arousal data to deviant sexual behavior by assuming that individuals with a history of sexual offenses who respond to illicit sexual stimuli are likely to react in furtherance of their responses.  There is no scientifically accepted data presented to justify this assumption, nor does it have any

---

[16] Odeshoo, supra n. 1, at 6 (citing Freund, Kurt, *et al., The Female Child as a Surrogate Object,* 2 Archives of Sexual Behav. 131, 132 (1972)).

[17]*Id.*

logical basis.  Rather, just as with the polygraph (lie detector) machine, it is used as a tool of coercion by both law enforcement personnel and treatment providers.  The plethysmograph is used to obtain inculpatory admissions, the reliability of which is at best equivocal.  The patient or suspect may believe he can manipulate the results — and with a modicum of sophistication or psychopathy, he may well be able to do so.  Or, the suspect or patient may succumb to the threat, overt or implied, that his refusal to submit to testing has negative implications that can result in further incarceration, withholding of privileges or being held back in the treatment or incarceration processes and therefore lie about his interests or past behavior.  Moreover, it is not fanciful speculation that false test results can be conveyed to the individual in order to reduce resistance and gain inculpatory admissions.

In sum, the plethysmograph is used in some instances to produce adverse consequences that are predetermined.  Just how efficacious current sex offender treatment using the penile plethysmograph is in reducing deviant behavior is best judged by recidivism rates which, such as they are, do not present a serene or confident prognosis.[18]

Another point is that administering a penile plethysmograph test necessitates the person administering the test to be engaged in the possession, use and distribution of child pornography.  There is no exception in the statute to exclude therapeutic purposes or intent from culpability.  The violation is *per se.*  It is paradoxical that the government

---

[18] For a thorough evaluation of recidivism rates for sex offenders see Judge Posner's opinion in <u>Bella v. Wall</u>, 811 F.3d 929, 934-36 (7th Cir. 2016).

would mandate individuals subject to supervised release to join an administrator of the test in conduct so vile that it landed him in prison in the first place.  The statute criminalizing the possession, use and distribution of child pornography has no exceptions.  Both the administrator and the subject are violating the statute.  Moreover, the well-established continuing damage inflicted on the child victims portrayed in the pornography derives from the fact that they are seen repeatedly by viewers and it makes not one shred of difference to the victims that the viewer is a pervert or a therapist.

In his concurring opinion in United States v. Weber,, Judge Noonan wrote:

> Judge Berson's excellent opinion is deserving of support.  I would, however, go beyond it to hold the Orwellian procedure at issue to be always a violation of the personal dignity of which prisoners are not deprived.  The procedure violates a prisoner's bodily integrity by affecting his genitals.  The procedure violates a prisoner's mental integrity by intruding images into his brain.  The procedure violates a prisoner's moral integrity by requiring him to masturbate.  By committing a crime and being convicted of it, a prisoner does not cease to be a person.  A prisoner is not a mere tool of the state to be manipulated by it to achieve the purposes the law has determined appropriate in punishment.  The prisoner retains his humanity and therefore his purposes transcend those of the state. . . . Similarly, a prisoner should not be compelled to stimulate himself sexually in order for the government to get a sense of his current proclivities.  There is a line at which the government must stop.  Penile plethysmography testing crosses it.

451 F3d 552, 570 (9th Cir. 2006) (emphasis added).

## II.

Prohibiting courts, probation and parole officers and treatment facilitators and providers from using devices that fail tests of scientific validity is necessary, but a further comment about the line Judge Noonan describes so eloquently will perhaps provide a

resolution to the underlying debility.  Judge Noonan evokes the task of Orwell's "Thought Police" — and using what is "discovered" as a basis for further punishment or superficial rehabilitation.  Justice Cardozo in Palko v. Connecticut, 302 U.S. 319, 326-27 (1937) stated: "freedom of thought. . . is the matrix, the indispensable condition, of nearly every other form of freedom.  With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal."  In Texas v. Johnson, 491 U.S. 397, 404, Justice Brennan opined that while "[t]he First Amendment literally forbids the abridgment only of 'speech,'" this Court has "long recognized that its protection does not end at the spoken or written word."

The established traditions of our law embrace the ancient common law principle that liberty should not be impinged or threatened for what a person thinks, but only for what a person does. The maxim *cogitationis poenam nemo patitur* (no one is punishable solely for his thoughts) was written long before the invention of the plethysmograph or other machines intended to probe the recesses of the mind.  It is interesting to observe that while obscenity has never been considered protected by the First Amendment, the Supreme Court in Stanley v. Georgia, 394 U.S. 557, 565-66 (1969) struck down a Georgia law that banned the private possession of obscene material, finding the law "wholly inconsistent with the philosophy of the First amendment.""Our whole constitutional heritage," explained the Court, "rebels at the thought of giving government the power to control men's minds."

Penile plethysmograph tests rely on the heavy assumption that stimuli arousal is

strongly related to the potential for recidivism.  Inferences by the courts about a person's

potential for sexual offense based on his innermost sexual desires fail to acknowledge that

arousal data is not an ineluctable precursor to deviant behavior.  This observation, a

fortiori, illustrates the dangerous conflation of thought with behavior.  Before

administering the penile plethysmograph without questioning its obvious scientific

shortcomings (not to mention its ethical implications), it is crucial that the courts,

probation and parole officers and PPG evaluators recognize 1) the power of refrain; and

2) the difference between thought and action.  The presuppositionless assumption is that

any "arousal level" occasioned by the exposure to child pornography stimuli is deviant

because convicted sex offenders are unable to resist or subdue their impulses.  Urges,

however, are not always overwhelming.  Otherwise, there would be no opportunity for

moral decisions or even so-called enlightened self-interest decisions to be made in the

crucible of an experience.

*Conclusion.*

It is argued at various places in the vast literature on this subject I have reviewed

that the value of the plethysmograph is not to condemn or to judge, but rather to facilitate

the evaluation and therapy undertaken by nudging the subject along to admit his defect of

character — a sort of plaintive admonition that confession is good for the soul and

overcomes the resistance to therapy that is manifested in denial.  Such admission is

regarded as one of the first steps toward a rehabilitative state of refrain and abstinence.

Perhaps it should be considered a shortcut in therapy.  (One can only surmise that a

12

relapse after treatment would exacerbate the perversion because it occurs in spite of the therapy generated by the conscious admission.)

The Court of Appeals for the Second Circuit held in United States v. McLaurin, 731 F3d 258, 260 (2013) that a condition of defendant's supervised release that required him to take penile plethysmograph testing was an "extraordinary invasive condition [that is] unjustified, is not reasonable related to the statutory goals of sentencing, and violates McLaurin's right to substantive due process."

The special condition requiring Cheever to submit to plethysmograph testing is specifically rejected.  So, too, until such time as I am presented by the government with proof that the polygraph and the visual reaction time measurement device will meet the goals of supervised release as applied to a particular defendant, that such testing will involve no greater deprivation of liberty than is necessary for the particularized supervised release of an individual defendant and that there are no alternative measures, techniques or devices available that are any less intrusive to freedom of thought, they, too, are rejected.

*s/John L. Kane*_____
SENIOR U.S. DISTRICT JUDGE

13